ORIGINAL

FILED

2022 DEC -5 PM 1:41

U.S. DISTRICT COURT
MIDDLE DISTRICT OF TN

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| UNITED STATES *ex rel.* DONNA SHERRILL,<br><br>Plaintiff,<br><br>v.<br><br>CENTENE COPORATION, LLC ("CENTENE").<br><br>Defendant. | **CIVIL ACTION NO.** 03-22 0981<br><br>**COMPLAINT**<br><br>**FALSE CLAIMS ACT, 31 U.S.C. § 3729, *ET SEQ.*** |

## I. INTRODUCTION

*Qui tam* relator Donna Sherrill ("Relator") brings this action to recover treble damages and civil penalties under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA"), on behalf of the United States against Defendant Centene Corporation, LLC ("Centene" or "Defendant").

1. Centene improperly enrolled beneficiaries in Medicare Advantage plans by invoking the special enrollment period ("SEP") for which only participants, or former participants, of qualified State Pharmaceutical Assistance Programs ("SPAPs") are eligible pursuant to 42 C.F.R. § 422.62.

2. Centene fraudulently and repeatedly invoked that SEP to justify the enrollment of individuals who were *not* SPAP participants, never had been, and *never could be because there were no SPAPs for which they were eligible.*

3. Centene's use of the SPAP exception, rather than another exception, was not accidental: it was chosen because it required no real-time documentation.

4. Centene also misinformed prospective participants concerning the benefits to which they would be entitled upon enrollment by overstating plan benefits. It is a recidivist actor in this area.

5. This conduct is against the backdrop of Centene's use of unrealistic sales targets and a commission structure that disproportionately rewards high enrollments and over-punishes low enrollments, rather than a per-enrollee flat commission.

6. The government is damaged in that beneficiaries improperly switching among Medicare Advantage plans may not only raise costs unrelated to actual patient care in derogation of government policies concerned about precisely this outcome, but also facilitate increased enrollment fees and (if beneficiaries join mid-year) capitated rates.

## II. JURISDICTION, VENUE, AND STATUTORY REQUIREMENTS

7. Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA.

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on the Court for actions brought under the FCA, 31 U.S.C. §§ 3729 and 3730.

9. This Court has personal jurisdiction over the Defendant, and venue is proper in the District, pursuant to 28 U.S.C § 1391(b) and 31 U.S.C. § 3732(a), because the Defendant transacts business and committed violations of 31 U.S.C. § 3729 in this District.

10. This action is not based on prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form, as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

11. To the extent that there has been public disclosure unknown to Relator, those disclosures are original sources under all relevant statutory provisions. Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which her allegations are based and has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## III. PARTIES

12. Relator Donna Sherrill is a natural person residing in the state of Tennessee. Since September 2020, Relator has been employed by Defendant as a Medicare Benefits Advisor ("MBA"). Relator therefore has personal knowledge of the facts alleged herein acquired in the normal course of her employment.

13. As an MBA at Centene, Relator's job is to market and sell Centene's Medicare Advantage plans to prospective beneficiaries in Tennessee. Relator also facilitates the enrollment of such beneficiaries into those plans.

14. Prior to her employment at Centene, Relator worked in similar positions at Cigna and HealthSpire. During her employment at HealthSpire, Relator's responsibilities included training other employees engaged in selling Medicare Supplements.

15. Defendant Centene Corporation LLC is a Delaware corporation with its principal place of business at 7700 Forsyth Boulevard, St. Louis, Missouri 63105.

16. Centene is engaged in a joint venture with Ascension, a private healthcare system, to offer Medicare Advantage plans, known as Ascension Complete, in several states, including Tennessee.

17. The insurance products that Relator markets and sells in Tennessee are Ascension Complete Medicare Advantage Plans and Medicare Advantage Prescription Drug Plans.

## IV. REGULATORY BACKBROUND

### A. Medicare Advantage

18. Congress enacted Medicare Part C, known as Medicare Advantage, in 1997. Under Medicare Advantage, qualified individuals can opt out of the traditional fee-for-service coverage offered by Parts A and B, and instead enroll in privately-run managed care plans that provide coverage for both inpatient and outpatient services. See 42 U.S.C. §§ 1395w-21, 1935w-28.

19. Medicare Advantage allows private health insurance companies to administer Medicare benefits on behalf of the United States. Enrollees benefit by joining these Medicare Advantage Organizations ("MAO") plans and paying monthly premiums, which are often less than the payments and deductibles available to them under traditional Medicare.

20. An MAO does not bill for services rendered; rather, CMS pays for the care of enrolled persons in advance, using monthly capitated rates for each beneficiary.

21. The capitated rates are adjusted for an MAO's risk based on beneficiary's health conditions and demographic characteristics, such as dual eligible status, disability eligibility status, and institutional status.

22. Prior to setting capitated rates, CMS receives rate bids from MAOs and compares those bids to a benchmark rate on a county-specific basis. The benchmark rate is the average cost of coverage for a fee-for-service Medicare Advantage enrollee.

23. MAOs that bid above the benchmark receive the benchmark rate from CMS and must collect the difference from beneficiaries; MAOs that bid below the benchmark rate split the "savings" (i.e. the difference between the bid and the benchmark) with CMS.

24. Pursuant to 42 C.F.R. § 422.304, CMS makes advance monthly payments to MAOs based upon those rates and the number of beneficiaries enrolled. Any overpayment, such

as would result from the enrollment of individuals during an SEP to which those individuals were not legally eligible, retained by a MAO establishes an obligation under the FCA if not reported and returned. 42 C.F.R. § 422.326.

**B. <u>Joining a New Medicare Plan</u>**

25. Generally, those interested in joining, switching, or dropping a Medicare Advantage program may only do so during an annual election period or an initial enrollment period. There are, however, a number of statutorily created SEPs, which allow for Medicare Advantage enrollment outside of those periods. See 42 C.F.R. § 422.62.

26. Pursuant to 42 C.F.R. § 422.62(b)(12), an individual who is enrolled in an SPAP, or loses SPAP benefits, is eligible for an SEP to make one Medicare Advantage election per year.

27. Without strict limitations on the timing of Medicare Advantage enrollment, individuals could wait to enroll until they face significant medical costs. That behavior—a form of adverse selection—can threaten the stability of insurance markets by increasing premiums and pricing out lower risk beneficiaries.

28. Potential enrollees rely on the information provided by MAOs to select among Medicare Advantage plans; the presentation of inaccurate information distorts those selections.

29. MAOs, like Centene, "may not mislead, confuse, or provide materially inaccurate information to current or potential enrollees." 42 C.F.R. § 422.2262.

30. MBAs, like Relator, receive a commission for each new Medicare Advantage beneficiary they enroll pursuant to both 42 C.F.R. § 422.2274 and internal Centene policy. Notably, if a beneficiary changes plans mid-year, if enough time has elapsed after the initial enrollment, the Centene broker or employee enrolling the beneficiary receives a commission and

the commission for the previous enroller has vested. In other words, improper switches raise the overall payments to brokers and employees.

### C. State Pharmaceutical Assistance Programs

31. SPAPs are state-run programs that assist enrollees in paying for prescription drugs. The programs vary by state and have different eligibility requirements based upon, for example, age and chronic health condition.

32. SPAPs supplement the financial assistance available to Medicare Advantage enrollees, thus reducing out-of-pocket drug costs for participants.

33. Approximately one-third of states have SPAPs that provide broad financial assistance, like Medicare, to older individuals. Notably, the states at issue in this case either do not have such programs, or have eligibility limitations that Centene ignored: Tennessee, Alabama, and Michigan do have an SPAP that provides broad financial assistance; and, while Indiana's HoosierRx program supplies such assistance, it requires Part D enrollment and that enrollees have an annual income under 150 percent of the federal poverty level.

## V. FACTUAL ALLEGATIONS

### A. Defendant Falsely Claimed Individuals Qualified for SPAP SEP to Increase Medicare Advantage Enrollment.

34. Since at least May 2022, Defendant has fraudulently enrolled individuals in Medicare Advantage plans by falsely reporting that enrollees participated, or had participated, in SPAPs and were thus eligible for an SEP.

35. Defendant assigns MBAs a target number of Medicare Advantage enrollees each month upon which they receive a commission. Defendant does not pay a fixed commission, but instead has introduced a new commission structure pursuant to which MBAs receive a larger commission as they enroll more beneficiaries. Based on Relator's experience working with

different managed care plans, Centene's targets were dramatically harder to meet than competitors, and the consequences of low enrollments were more pronounced because the commission payment structure was steep.

36. Defendant thus created and maintained an environment that caused MBAs to enroll Medicare Advantage beneficiaries fraudulently by assigning unrealistic target numbers of new enrollees each month and establishing a new, tiered commission structure pursuant to which most MBAs were paid significantly less than they had been previously for the same number of enrollments.

37. Defendant caused the fraudulent enrollment of Medicare Advantage beneficiaries by means of the SPAP exception by, *inter alia*, encouraging for MBAs and/or prospective enrollees to utilize the SPAP exception without verification of SPAP enrollment and in states where there is no SPAP, or an SPAP whose beneficiaries are narrowly limited.

38. Multiple managers at Centene acknowledged the scheme and were aware of or touted its efficacy in states outside of Tennessee.

39. Centene's Tennessee Sales Manager during the relevant time, Roy Smith, held regular team meetings. During those conference calls, Mr. Smith encouraged Centene's Tennessee-based MBAs to boost enrollment in Medicare Advantage plans. After each of those meetings, including those held May 13, 2022 and May 27, 2022, Mr. Smith circulated notes that instructed MBAs to "[u]se the SPAP election if you need to find a SEP for enrollment."

40. High-level Centene Medicare Manager Robert Herbst similarly instructed Relator and other MBAs to use the SPAP exception improperly, including in meetings in May 2022 when he instructed Relator and Centene's other Tennessee-based MBAs to falsely enroll prospective Medicare Advantage beneficiaries pursuant to the SPAP SEP. Mr. Herbst explained

that the MBAs should utilize that particular SEP because CMS does not verify eligibility, and because the scheme was successful in other states.

41. Relator and other MBAs followed Centene policy and enrolled new members under false pretenses. All these enrollments are reflected in central company databases—notably, Centene allowed MBAs to enroll beneficiaries pursuant to the SPAP exception even in states where there was no SPAP or an SPAP only for very limited circumstances—and some are even reflected in emails. As one MBA noted in a May 12, 2022 email to management, she "ended up needing to use the [SPAP] SEP" to secure the enrollment.

42. Centene management continued to push the improper use of the SPAP exception in the following months, including in a mid-August 2022 meeting in which Mr. Smith encouraged Centene's Tennessee-based MBAs, including Relator, to enroll Medicare Advantage beneficiaries pursuant to the SPAP exception despite acknowledging that Tennessee does not have an SPAP broadly applicable to prospective enrollees.

43. During that same call Mr. Smith both gave additional context to the scheme, and made clear the fraud was known within the meaning of the FCA.

44. First, Mr. Smith endorsed misinforming prospective Medicare Advantage enrollees that they were SPAP participants because they had the opportunity to utilize discount cards from GoodRx, a private healthcare company. Mr. Smith acknowledged during that call that the use of discount cards issued by private healthcare companies, such as GoodRx, does *not* constitute participation in a qualified SPAP pursuant to 42 C.F.R. § 422.62.

45. Second, Mr. Smith explained that the MBAs should utilize the SPAP exception to enroll Medicare Advantage beneficiaries because CMS had never denied an application submitted on that basis.

46. Further evidence of knowledge is found in Centene's efforts to cover-up their conduct in response to concerns: following the aforementioned meeting in August 2022, Relator raised concerns to Mr. Smith regarding the practice of fraudulently invoking the SPAP SEP. After she did so, Mr. Smith continued to instruct Relator and her colleagues to invoke SEP but excluded those exhortations from the notes circulated after each team meeting.

47. Since May 2022, Relator, acting under direction from Centene, has fraudulently enrolled most or all of the following individuals pursuant to the SPAP SEP at the behest of her supervisors: ADS, MWW, DF, PLO, HCO, MM, RPD, MAB, VEH, TLJ, JTL, BGL, and CLM.[1]

**B. Defendant Misled Prospective Enrollees Concerning Ascension Complete Benefits.**

48. Centene provides certain Ascension Complete enrollees with a Flex Card, which is a prepaid debit card that, as set forth in the plan's 2022 Evidence of Coverage, can be used by enrollees "to help reduce [their] out of pocket expenses for dental, vision, and hearing services."

49. As described by Centene, the Flex Card has an annual limit and a maximum amount that may be spent at a vision provider or for vision-related services and expenses. As described in the plan's 2022 Evidence of Coverage, all "remaining benefit dollars may be spent between dental and hearing as you see fit." The documentation does not set forth a maximum amount that may be spent at a dental provider or for dental-related services and expenses.

50. Prospective enrollees, as well as Centene's Tennessee-based MBAs, were informed that there was no restriction on the value of Flex Card benefits that could be spent at a dental provider or for dental-related services and expenses.

[1] The full names and Medicare Numbers of these enrollees are included in the confidential disclosure supplied to the government.

51. Notwithstanding that description, enrollees have informed Centene's Tennessee-based MBAs that there is a $750 maximum on dental benefits paid for with the Flex Card.

52. On April 8, 2022, Charles Woelfert—a Regional Director of Sales at Centene—confirmed via e-mail that the benefits described in Centene's marketing materials inaccurately describe the Flex Card benefit.

### C. Summary: Falsity, Materiality, and Scienter

53. ***Falsity***: Defendant submitted false statements and claims to CMS that enrollees were eligible for an SPAP special enrollment period pursuant to 42 C.F.R. § 422.62 and misinformed prospective enrollees of potential benefits under Defendant's Medicare Advantage plans. In so doing, Defendant violated its contract with CMS, which requires that Defendant comply with "[f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of...the False Claims Act." 42 C.F.R. § 422.504. Further, Centene had obligations when there were overpayments.

54. ***Materiality***: Defendant's false statements and claims were material. The SPAP SEP exists "[b]ecause SPAP eligibility may influence an individual's choice of [Medicare Advantage] plan." CMS thus adopted regulation establishing the SPAP SEP so that enrollees could "coordinate" the benefits of their Medicare Advantage plan with any changes in SPAP eligibility. Defendant's false statements and claims undermined that goal and were material to the Government's decision to pay the Medicare Advantage capitated rate to Defendant for the care of persons who would not otherwise have been eligible for enrollment. Defendant misled prospective enrollees regarding their potential benefits under Defendant's Medicare Advantage plans to induce those fraudulent enrollments.

55. ***Scienter***: Defendant, who has entered into recent previous settlements involving health care fraud, knew that the statements and claims they submitted to Medicare Advantage

were false, or they acted with deliberate indifference or reckless disregard toward the truth or falsity of their statements and claims. Defendant instructed MBAs to report falsely that enrollees were eligible for the SPAP SEP, and provided information that incorrectly described Defendant's Medicare Advantage plan benefits. Defendant had a pattern of doing so, highlighting that CMS had never turned down a Medicare Advantage application based upon the SPAP SEP and spreading fraudulent practices among MBAs in different states. Defendant did not allow scrutiny or exposure of those practices, as shown by the omission of references to the SPAP SEP in team meeting notes after Relator raised the issue. Defendant facilitated the fraudulent invocation of the SPAP SEP by permitting MBAs to invoke that exception on behalf of enrollees who were not SPAP participants, never had been, and never could be because there were no SPAPs for which they were eligible.

## VI. CAUSES OF ACTION

### COUNT I

**(False Claims Act, 31 U.S.C. § 3729, et seq.)**

56. Relator incorporates the preceding paragraphs of the Complaint as fully set forth herein.

57. This is a civil action brought by Relator, on behalf of the United States of America, for treble damages and penalties against Defendant under the False Claims Act, 31 U.S.C. § 3730(b)(1).

58. Through the acts described above, Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

59. Through the acts described above, Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records and/or statements to get false or fraudulent claims to the United States paid, in violation of 31 U.S.C. § 3729(a)(1)(B).

60. Through the acts described above, Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

61. Through the acts described above, Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

62. The United States, unaware of the falsity and fraudulent nature of the records, statements, and claims made or caused to be made by Defendant, paid and continues to pay claims that would not be paid but for Defendant's fraudulent scheme.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests judgment against Defendant as follows:

A. That Defendant be ordered to cease and desist from submitting any more false claims, or further violating the FCA;

B. That judgment be entered in the United States of America's favor and against Defendant in the amount of each and every false or fraudulent claim, multiplied as provided for

in 31 U.S.C. § 3729(a)(1); a civil penalty of not less $5,500 or more than $11,000 per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990; and damages as set out in 10 U.S.C. § 2306a and 48 C.F.R. § 52.215-10;

C. That Relator bc awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D. That Relator be granted all relief available under 31 U.S.C. § 3730(h), including reinstatement, twice back pay, and special damages;

E. That judgment be granted for Relator against Defendant for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

F. That Relator be granted such other and further relief as the Court deems just and proper.

## VII. JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

Dated: December 5, 2022

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: *s/ Mark P. Chalos*
Mark P. Chalos

Mark P. Chalos (BPR # 19328)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
Facsimile: (615) 313-9965
mchalos@lchb.com

Rachel Geman
Margaret J. Mattes
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
rgeman@lchb.com
mmattes@lchb.com

Daniel Ocasio
Felix R. Armenteros
DANIEL OCASIO WHISTLEBLOWER LAW GROUP
660 North Capitol Street NW
Washington, DC 20001
Telephone: (202) 926-3235
docasio@djolawgroup.com

*Attorneys for Plaintiff-Relator*